other.   The provision, however, requiring payment of the specific money or the delivery of the checks does add to the general provision requiring monthly payments, and it is obvious that without such a specific provision the judgment will prove as futile as the Pennsylvania judgment has been thus far.

The judgment and order should be affirmed, with costs.

INGRAHAM, P. J., and LAUGHLIN and SCOTT, JJ., concur. McLAUGHLIN, J., dissents.

(142 App. Div. 44.)

WILLCOX et al. v. RICHMOND LIGHT & R. CO. et al.

(Supreme Court, Appellate Division, Second Department.   December 30, 1910.)

1. CARRIERS (§ 18*)—REGULATION—PUBLIC SERVICE COMMISSION—POWERS.

Public Service Commissions Law (Laws 1907, c. 429) § 48, gives the Public Service Commission power to issue orders, but not to enforce them.   Under section 57 alone can the direction of the commission be enforced.   *Held* that, under section 48, the commission may investigate the facts, and, if they conclude that a street railroad company is violating the law and that action should be taken, they may proceed summarily under section 57 without further investigation, or they may move under section 57 without any previous investigation; the two sections being supplementary of each other, so that the Commission may proceed under either or both concurrently

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 18.*]

2. CARRIERS (§ 18*)—REGULATION—PUBLIC SERVICE CORPORATION—PROCEEDINGS.

An investigation begun under section 48 of the Public Service Commissions Law (Laws 1907, c. 429), conferring upon the Public Service Commission power to issue orders, but not to enforce them, is not an action pending, so as to bar a proceeding under section 57, giving the commission power to enforce its direction.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 18.*]

3. CARRIERS (§ 18*)—REGULATION—STREET RAILROADS—TRANSFERS.

The charters of two street railway companies each contained a section by which each agreed to transport passengers over the entire length of any of its lines of railroad within the village of B. at a fare not over five cents for each continuous trip of each passenger, and allow each passenger one transfer from any one to any other of its said lines, and to transfer passengers to and from the lines of other street surface railways within said village, whose lines of railroad connected with or intersected its lines, upon such terms as to division of the fare paid by each passenger not exceeding five cents between points within the village as should be agreed upon.   *Held*, that a refusal to issue transfers at proper points was a violation of their charter obligation and of law, and under Public Service Commissions Law (Laws 1907, c. 429) § 57, the Public Service Commission could institute summary proceedings to compel the issuance of such transfers.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 18.*]

4. MUNICIPAL CORPORATIONS (§ 661*)—STREETS—TITLE.

The title to streets was formerly in the crown and passed in this country to the people of the respective states, subject as to their regulations and use to the authority of the Legislature.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1432; Dec. Dig. § 661.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from Special Term, Richmond County.

In the matter of the application of William R. Willcox and others, constituting the Public Service Commission for the First District, to compel the Richmond Light & Railroad Company and the Staten Island Midland Railway Company to exchange transfers at certain points in the borough of Richmond, pursuant to section 57 of the Public Service Commissions Law. Judgment for petitioners, and defendants appeal. Affirmed.

The following is the opinion of Justice Clark at Special Term:

As indicated by the above title, this proceeding is brought to compel the two defendants, both surface trolley roads in the former village of New Brighton, to issue and receive transfers over certain street surface railway lines, to wit: Over the Castleton Avenue or Brighton Heights line of the Richmond Light & Railroad Company (hereinafter called the Richmond Company), and over the Manor Road line of the Staten Island Midland Railway Company (hereinafter called the Midland Company); and also over the Elizabethport Ferry line of the Richmond Company, and the Manor Road line of the Midland Company at the following points: (1) The intersection of Columbia street and Castleton avenue; (2) the intersection of Castleton avenue and Broadway; and (3) the intersection of Broadway and Richmond Terrace.

The charters of the two street railway companies were obtained in the years 1895 and 1896, were reduced to contract form, and, as executed, were approved by ordinances duly passed by the board of trustees of the village of New Brighton. The two companies accepted their respective charters, under which the operation of both lines has been had until the present time. The Richmond Company has operated under a charter dated March 28, 1895, granted to its predecessor in title, the Staten Island Electric Railroad Company. This charter contains the following provision: "Twelfth. The railroad company expressly agrees that it will transport passengers over the entire length of any of its lines of railroad within the village at a rate of fare not exceeding five cents for each continuous trip of each passenger, and will allow to each passenger paying such fare, if requested by such passenger, and subject to reasonable regulations, one transfer from any one to any other of its said lines; and also agrees that it will receive passengers by transfers from and transfer passengers to the lines of other street surface railroads within said village whose lines of railroad connect with or intersect its lines of railroad, upon such terms as to division of the fare paid by each such passenger, which shall not exceed five cents between points within the village, as shall be agreed upon between said railroad company and such other company or, in default of agreement upon a division of such fare in proportion to the mileage of the system owned at that time by each company." The Midland Company has also operated under its charter from the village of New Brighton, dated July 2, 1896, which also contains a section numbered "twelfth," which is expressed in the exact language of section twelfth of the franchise issued by the village of New Brighton to the Richmond Company, above cited. Although looking to the charters above mentioned alone for whatever franchises they may possess to operate street railways and to occupy the streets of the village of New Brighton, it appears that each railroad company has from the beginning refused, and still refuses, to interchange transfers with passengers traveling on the other line. It is in evidence that such transfers have been demanded and been refused. The witness Sims, general manager of both companies, has testified that no system of transfer has ever existed between the two roads or in connection with their operation. The commission now seeks to compel the railroad companies to carry out the charter obligations imposed upon them.

The grounds upon which the complainants in this action seek relief are as follows:

(1) That sections 104 and 78 of the railroad law (Laws 1890, c. 565 as amended by Laws 1892, c. 676) have been violated.

(2) That the defendants have failed to perform the conditions, as to transfers, imposed upon them by their respective charters.

(3) That the law has been violated, in that the defendants have operated their roads without the consent of the local authorities.

(4) That section 26 of the Public Service Commissions Law (Laws 1907, c. 429) has not been observed.

The last ground requires no consideration in this case, inasmuch as the issue whether the fares now charged are just and reasonable has not been tried, nor has evidence been presented to show that the defendants have failed to procure necessary consents. If there be sufficient ground for holding, that under sections 78 and 104 of the railroad law the commission may be entitled to relief, yet, inasmuch as such relief may apply to a small section only of the Midland route on Castleton avenue, which has been covered by a common trackage agreement between the two companies, and seems to promise only partial relief herein, that ground has not been considered.

Preliminarily, the defendants challenge the jurisdiction of the commission, and urge that in a case of the character of the one at bar the commission, having elected (not, in fact, elected, as the commission proceeds under the Blair complaint, section 48, subd. 2) to proceed under section 48, must proceed to a determination of the question involved—that is, to a final order—before it can proceed under section 57. This contention is not well founded. In the first place, section 48 bears the subtitle "Investigations by Commission," whereas section 57 is entitled "Summary Proceedings." An examination of section 48 shows that it confers upon the commission power to issue orders, but not to enforce them. Under section 57 alone can the directions of the commission be enforced. In providing for the investigation of violations or omissions on the part of corporations, the commission has power to make investigations and inquiry, either upon the complaint of any person or corporation aggrieved or upon its own motion. The commission is granted full power to investigate and determine whether the facts are sufficient to justify the issuance of its order. Section 48 is clearly framed for the purpose of enabling the commission, in advance of the issuance of any order or the bringing of any action, to acquaint itself so thoroughly with the facts that it may form an opinion whether to dismiss or prosecute. If, after such investigation of facts, the commission shall have reached a conclusion that action shall be taken, then and then only can the law be vindicated by summary proceedings taken under section 57. In such a case the previous investigation may be the foundation upon which summary proceedings may be instituted, or under section 57 such proceedings may be instituted when the commission, either with or without previous investigation, shall be of opinion that a street railroad corporation is doing anything contrary to or in violation of law. In either case, namely, after an investigation, or upon an opinion derived from any source, the commission is authorized to proceed summarily to correct it. The two sections are supplementary of each other and not inconsistent, and the commission is entitled to proceed under either or both simultaneously, as may be deemed necessary.

Equally weak is the suggestion of the defense that an investigation begun under section 48 constitutes an action pending which bars the proceeding under section 57. Such a claim violates too many of the elements required to be shown for the establishment of any bar before the defense of another action pending can be raised or sustained.

The main issue on the merits raised by the defense is whether the failure by the defendants to perform their charter obligation is "a violation of law," as that term is used in section 57. This defense, if sustained, goes to the root of the litigation, and is controlling, because in that question is involved the right of the commission to maintain this proceeding. The title to streets was formerly in the crown, and passed in this country to the people of the respective states, subject, as to their regulations and use, to the authority of the Legislatures. In this state and elsewhere control of such

use and regulation has been delegated in large measure by the Legislature to local authorities, including municipalities and villages.

In the case at bar, the village of New Brighton was created by a special act of the Legislature (Laws 1866, c. 819), which gave to the board of trustees of the village full control of the streets. The practice of municipalities in conferring street franchises on railway companies has varied; the common method being the passage of resolutions or ordinances, or by independent contracts which were duly approved by resolutions or ordinances. Here the two charters took the form of mutual agreements between the respective railroad companies and the village of New Brighton. These agreements were duly executed by both parties, and were approved by appropriate ordinances or resolutions passed by the board of trustees of the village of New Brighton. From the description contained in the pleadings, supplemented by an examination of the map of the village of New Brighton, it will be seen that in a general way the Richmond Company about 1895 operated along the north and east shores, which were then the most densely populated sections of Staten Island. The routes which they sought failed to penetrate the island to any extent, except along the Castleton Avenue branch, which enabled them to serve sparsely settled districts in the middle of the island. In the following year the Midland Company appeared as an applicant for routes distant from and supplementary to the route already preempted by the Richmond Company. At about this period, trolley construction was under way throughout the suburbs of New York, and the short interval which elapsed between the dates of the charters of the two companies in question indicates that both were then under consideration. In any event, it was naturally to be expected at that time not only that the Richmond Company would be followed by a second company, but that both might be followed by a third or more. It was not only, therefore, entirely natural, but even incumbent upon them, that the trustees of the village of New Brighton should, in admitting the first applicant, admit it in such way only as not to expose the village to a division into various sections where different trolley roads might subsequently be established, with the inevitable result that in passing from one point in the village to another many fares might be required. Not only was the insertion of the five-cent transfer clause a wise and prudent provision, but the omission of some such protection would have worked grave injustice to the people. There will be no question that each defendant, through the possession of charter rights in public streets, has become a quasi public corporation. Charters emanate from the people, and through them the people deal with the trolley companies. Treated as contracts, sufficient obligations have moved to and from each party thereto. The inducement moving the public was the acquisition of transportation. The inducement to the trolley companies was the privilege of using public streets for purposes of transportation.

In People v. Suburban R. R. Co., 178 Ill. 594, at page 607, 53 N. E. 349, at page 352 (49 L. R. A. 650), Mr. Justice Boggs, delivering the opinion of the court, says: "Respondent, treating the duties imposed upon it as mere contract obligations, argues the undertakings are wholly without consideration. In the absence of the ordinance, the respondent company had no power or right to enter upon the streets of the village and erect poles, string wires thereon, and construct and operate its road by electricity upon and along such streets. These privileges constitute ample consideration, if any could be deemed necessary. The privileges granted the respondent company by the terms of the ordinance have been and are being fully enjoyed by it. It cannot be permitted to take and retain all advantages and benefits of the ordinance, and escape performance of duties to the public upon which its rights to such advantages and benefits are predicated upon the ground the ordinance and the duties imposed by it are ultra vires both the village and the respondent company."

The defendants insist that the "violation of law" upon which the commission may act, under section 57, involves only such offenses as are specifically mentioned in the written law. Recognizing that the law prohibits certain acts and requires the doing of other acts, the defendants claim that

the jurisdiction of the Public Service Commissions extends only to such prohibitions or requirements as are found ipsissimis verbis of some statute. As an instance of the cases over which the defendants would concede the jurisdiction of the Public Service Commissions, they cite in their brief the requirement to be found in section 98 of the railroad law that street railroads must "have and keep in permanent repair that portion of said streets, * * * between its tracks, the rails of its tracks, and two feet in width outside of its tracks. * * *" This section is found in article 4 of the railroad law in connection with numerous other sections involving many petty matters of regulation. In the same railroad law are to be found conferred upon the former Board of Railroad Commissioners and now vested in the Public Service Commissions matters relating to consolidations, leases, sales and reorganizations, involving joint agreements, protection of rights, assessment of the property of the new corporation, representation of stocks of municipal corporations, foreclosure of mortgages, powers of corporations organized to acquire and operate railroads partly in the state, the leasing of roads, and the acquisition of stock therein, as well as the consolidation and leasing of parallel lines.

There is no apparent reason why there should be a distinction drawn between the powers which relate to the petty violation above cited by the defense and the larger powers above referred to, all of which are included in the railroad law and have devolved, with respect to their execution, upon the Public Service Commissions. In fact, there is little difference between testimony showing the obligation put upon street railway companies to keep streets in repair and testimony required in the case at bar where the public is asked to pay a nickel for riding through the village of New Brighton, instead of paying two nickels for the same service. In the former case procedure by complaint and investigation, order, and judgment for mandamus would be had on the evidence of some eyewitness that the required portion of the street was not kept in repair. In the case at bar, the Public Service Commission, after citing the parties before it, could introduce the two charters in evidence, prove noncompliance by the general manager of the two companies, and rest. Between these two cases, involving a small amount of testimony, is a wide zone, containing complicated cases and involving the taking of a large amount of testimony. In each case, however, the Public Service Commission is given the power to act by injunction, if it shall so choose, or by direct actions if that method shall be selected. Analysis of the defendants' position shows that what they attempt to make a question of power is merely a question of the amount of evidence which may be required; the latter involving not a jurisdictional question, but length of time. Meeting the defendants, however, upon their own ground, it has been held that obligations of the nature which the defendants assumed are not merely violations of covenants but are violations of law.

In a recent case in Illinois the whole matter was exhaustively considered, and the conclusion was reached that the ordinance of a duly authorized municipality was not by reason of its origin the mere resolution of the municipality, but was of equal quality with written law, and was with respect to the penalties attaching to its violation the equivalent of the written law. Roby v. City of Chicago, 215 Ill. 604, 608, 74 N. E. 768, 770. In the Roby Case, although a mandatory injunction was denied in part upon the theory that a taxpayer cannot maintain a bill in equity to compel a city to defend a suit against itself in a certain manner, the court took occasion to say: "The city council, under the general incorporation act, which is in force in the city of Chicago, has full power to pass an ordinance granting to a street railway company the right to operate its street railroad in the streets of the city, subject to such limitations as have been imposed upon such municipalities by the Legislature, and in so doing may prescribe the terms and conditions upon which such company may occupy the streets of the city with its tracks, cars, etc. The city in passing such an ordinance performs a legislative function, and in so doing acts as a governmental agency of the state, and the ordinance, when passed, has the force and effect of a law of the state." In the case last cited the

street railroad company had been organized by an ordinance duly passed by a municipality, and such ordinance represented the charter rights under which the railroad was operated. It was incorporated by no special act of the Legislature, nor did it possess through a charter or agreement any right to exercise its franchises in the city of Chicago. Nevertheless the learned court in its opinion used the very significant language that the "ordinance, when passed, has the force and effect of a law of the state." In the case at bar the village of New Brighton granted charters to the defendants, not only by ordinance or resolution, but also by express agreement, executed by both parties, the provisions of which were accepted and acted upon by each of the parties. With how much greater force, therefore, under the language of the opinion in the Roby Case, does the provision as to the interchange of passengers have "the force and effect of a law of the state," and with how much stronger effect does the failure of the defendants constitute a violation of law.

The only question in the case of prime importance is whether the failure of the defendants to interchange fares is a violation of law, which in my opinion has been established not only by reason but upon authority.

Judgment for the petitioners in accordance with this opinion, with costs.

Argued before HIRSCHBERG, P. J., and WOODWARD, BURR, JENKS, THOMAS, and CARR, JJ.

George S. Coleman, counsel to the Public Service Commission for the First District.

Joline, Larkin & Rathbone, for defendants.

PER CURIAM. Order affirmed, with $10 costs and disbursements upon the opinion of Mr. Justice Clark at Special Term.

---

### ABATE v. BIANCO.

(Supreme Court, Appellate Division, Second Department.    March 24, 1911.)

1. VENDOR AND PURCHASER (§ 130*)—MARKETABLE TITLE.

An intestate's interest under a contract to purchase land on which installments had been paid must be regarded as real estate, rendering unmarketable a title contracted to be conveyed by his widow, who completed the payments and took a deed.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 245, 246; Dec. Dig. § 130.*]

2. SUBMISSION OF CONTROVERSY (§ 19*)—SCOPE OF RELIEF—PARTIES.

Where, in a submitted controversy to determine the marketability of title which plaintiff has contracted to convey to a defendant, the title is found to be unmarketable, there should be no further adjudication, where holders of interests in the property are not represented.

[Ed. Note.—For other cases, see Submission of Controversy, Cent. Dig. § 21; Dec. Dig. § 19.*]

Submission of controversy by Maria Abate against Raymond Bianco, upon an agreed statement of facts, under Code Civ. Proc. §§ 1279–1281. Judgment for defendant.

Argued before JENKS, P. J., and BURR, THOMAS, CARR, and WOODWARD, JJ.

Charles D. Millard, for plaintiff.

Thomas M. Smith, for defendant.